84 So.2d 572 (1956)
Morris A. FISHER and State of Florida, Appellants,
v.
BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, Florida, et al., Appellees.
Supreme Court of Florida. En Banc.
January 6, 1956.
*573 George N. Jahn, Miami, for Morris A. Fisher.
George A. Brautigam, Miami, for the State.
Hudson & Cason, Francis G. Rearick, Miami, and Mitchell, Pershing, Shetterly & Mitchell, New York City, for appellee.
THORNAL, Justice.
The State of Florida and Fisher, a taxpayer who became a party by the filing of an answer, appeal from a decree validating an issue of bonds in a special statutory proceeding.
Ostensibly, pursuant to Chapter 27490, Laws of Florida, 1951, as amended by Chapter 28998, Laws of Florida, 1953, both local Acts, the Golden Shores Special Improvement Service District was created in a rural area of Dade County with authority to construct and maintain certain public improvements including the paving and repairing of streets and the providing of street lighting. It was provided that construction of such street improvements would be financed from the proceeds of the sale of bonds which would be liquidated in the manner hereinafter described. The statutes mentioned authorized the creation of "Special Improvement Service Districts" in Dade County. In accordance with requirements of the Acts, petitions were duly filed with the Board of County Commissioners of Dade County requesting the establishment of the District, describing the improvements desired and petitioning "for the levy of special assessments to pay the cost" of the improvements and special services. The County Commissioners referred the petition to the County Engineer for study and recommendations as required by the statutes. A report of the engineer was filed and the County Commissioners thereupon adopted an appropriate resolution declaring the District to be in existence, providing for the construction and maintenance of the street paving improvements, and for street lighting to be accomplished through a contract with a power company at an annual fee, and generally approving the project, including the issuance of so-called "special obligation bonds" in the amount of $75,000, all subject to the approving vote of qualified freeholders to be obtained in a referendum likewise required by the Acts. The record shows that 134 persons were qualified to participate in the referendum, that 93 actually voted and that all votes cast were in favor of the proposal.
The instant appeal is from a final decree entered in the special validation proceeding in the Circuit Court authorized by the Acts cited, and in many respects similar but in some respects differing from the general statutory validation proceeding set out in Chapter 75, F.S., F.S.A. No question is raised by the appeal as to the validity of the special validation proceeding outlined by the local Act. We, therefore, do not at this time subject it to the test of Section 20, Article III, of the Florida Constitution, F.S.A., which prohibits special acts "regulating the practice of courts of justice, except municipal courts". The decree of the trial Court purporting to validate the bonds must be reversed for other reasons. The questions hereafter discussed were raised *574 by the several answers addressed to the petition by appellant.
Aside from the resolutions of the Board of County Commissioners supported by the report of the County Engineer, no testimony was offered purporting to show the need or justification for the proposed improvements nor was any evidence other than the opinion of the Engineer submitted to sustain the conclusion reached by the County Commissioners that the real property in the District would be "specially benefited" in the manner announced by the resolutions and the final decree.
The crux of the problem will be found in Sections 7 and 9 of the resolution of the Board of County Commissioners which approved the proposal and which provided for its financing as follows:
"Section 7. The maximum amount of the special obligation bonds of said special improvement service district required to pay the cost of said street paving is $75,000. The estimated amount required annually to pay the principal of and the interest on such bonds is $10,000, the estimated amount required annually to maintain and repair said street paving is $2,218.05, and the estimated amount required annually to provide said street lighting is $930.00, being a total estimated amount of $13,148.05 required to be assessed annually upon all real property within said district (including homesteads) to finance said street paving and street lighting.

"Section 9. For the prompt payment of the principal of and the interest on such bonds, there shall be specially assessed in each year upon all real property within said Golden Shores Special Improvement Service District in Dade County, Florida (including homesteads), in proportion to the assessed valuation of such real property, an amount sufficient to pay the principal of and the interest on said bonds as the same shall fall due and to provide reserves therefor. There shall also be specially assessed in each year upon all real property within said district (including homesteads), in proportion to the assessed valuation of such real property, amounts sufficient to maintain and repair said street paving and to provide said street lighting. Such special assessments shall be extended and collected at the same time and in the same manner as County taxes are levied and collected. Such special assessments are hereby found, determined and declared to be in proportion to the special benefits such real property will receive from said street paving and street lighting, and such special assessments will not in any case be in excess of such special benefits." (Emphasis added.)
While the form of the proposed bond is not included in the resolution, it should be noted that it is provided that the principal of and interest on such bonds shall be paid by a special annual levy upon all real property within the district, including homesteads, "in proportion to the assessed valuation of such real property". It is further provided that maintenance and repair of the street paving and provision for street lighting shall be financed by a similar annual assessment against all property, including homesteads, again "in proportion to the assessed valuation of such real property". While the cost of annual maintenance and street lighting is "estimated" there is no restriction that it will not vary upward with a corresponding increase in the annual "assessment" based on ad valorem valuations in future years. Nothing could be more typical of pure ad valorem taxation. The question readily appearing is whether a special improvement district can be created with authority to pave and repair streets and provide street lighting and assess the costs and maintenance thereof against all real property within the district, including homesteads, entirely on the basis of the ad valorem valuation of such real property without particular regard to the "special benefits" accruing to such property from the particular improvements.
*575 Appellee attempts to justify an affirmative answer on the basis of the conclusions reached by the County Engineer which conclusions were submitted to the Board of County Commissioners in the Engineer's report and which constituted the basis for action by the County Commissioners. The salient aspect of the report of the County Engineer will be found in Sections 6-01 and 6-02 thereof which we quote as follows:
"6.01. Distribution of Costs  The project provides for different degrees of improvement on different streets, and therefore the costs to the individual lots abutting on some streets will be higher than the costs which should be levied against other lots not benefiting as much by the improvements. The costs of street lighting and additional storm sewer outlets should be levied principally against the lots in the project from south of 188th Street to what would normally be the depth of the first tier of lots north of 192nd Street, but not to exceed 150 feet, inclusive, because they will receive most of the benefit and will all be benefited equally by these facilities. It is assumed that additional storm outlets between 192nd and 195th Streets will be provided by the developers in that area which is as yet undeveloped, and will be paid for by the developers.
"An additional outlet at 188th Street will also be provided later by developers of property south of 188th Street. In general, it is assumed that costs of gutters and street work will be assessed principally against the properties directly affected, and in every case in proportion to benefits received.

"Special assessments upon all real property within the district (including homesteads) shall be in proportion to the assessed valuation of such real property, and in the opinion of the County Engineer this is in proportion to the benefit to be received.

"6-02. Estimated First Cost and Annual Charges  Estimated costs are shown in Table 1, following. No exact evaluation of benefits has been made. However, it is the opinion of the County Engineer that improvements and services petitioned for will be of special benefit to all real property within the proposed district, and that the costs of providing such improvements and special services will not be in excess of such special benefit." (Emphasis added.)
The weakness in the position of the appellees is revealed by the report upon which they rely. An examination of the quoted portions of the report shows that "the project provides for different degrees of improvement on different streets, and therefore the costs to the individual lots abutting on some streets will be higher than the costs which should be levied against other lots not benefiting as much by the improvements." The exact nature of the difference of "degrees of improvement" on different streets is not shown, nor does the record reveal the relative ad valorem valuations on streets where the costs will be higher as contrasted to those on the streets where the costs will be lower and whether the distribution of costs has been adjusted accordingly. The report further suggests that the costs of lighting and additional storm sewer outlets be levied principally against subdivided lots in a certain section of the district and not against an un-subdivided portion in the north end of the district known as "Government Lot 5" because the subdivided lots "will receive most of the benefit and will all be benefited equally by these facilities". Although the County Engineer submits the "opinion" that special assessments on all real property within the district, including homesteads, should be in proportion to "the assessed valuation of such real property" because in his opinion "this is in proportion to the benefit to be received", nevertheless, in Section 6-02 of the report it is readily admitted that "no exact valuation of benefits has been made".
*576 It is perfectly obvious from an examination of the record that it presents an effort to avoid the homestead tax exemption provisions of Section 7, Article X, of the Florida Constitution, which reads as follows:
"Every person who has the legal title or beneficial title in equity to real property in this State and who resides thereon and in good faith makes the same his or her permanent home, or the permanent home of another or others legally or naturally dependent upon said person, shall be entitled to an exemption from all taxation, except for assessments for special benefits, up to the assessed valuation of Five Thousand Dollars on the said home and contiguous real property as defined in Article 10, Section 1, of the Constitution, for the year 1939 and thereafter. * * *" (Emphasis added.)
We have quoted from the Constitution as it was amended in 1938. Prior thereto and as originally approved, the phrase "except for assessments for special benefits" read "other than special assessments for benefits". While the instant case does not require an examination into the technical differences that might result from the change in the language of the organic law in order to distinguish earlier cases, nevertheless, we must measure the proposal before us by the standard established in the Constitution as now written. In other words, in the light of the record before us, can the annual ad valorem assessments against all real property, including homesteads, be construed as assessments "for special benefits" to the homesteads involved so as to subject them to the levy provided for by the resolution of the County Commissioners and approved by the validation decree?
We are not unmindful of the conclusion submitted by the County Engineer that in his opinion the benefits to the property involved would be in proportion to the assessed valuation of such property. However, in the same report it is admitted that no exact evaluation of benefits has been made. In fact, except for the bald conclusion submitted there is nothing in this record to show any actual attempt to evaluate the benefits to be received by the various properties abutting the streets to be improved. The unsupported conclusion of the County Engineer under the circumstances revealed in this record regardless of his ability and integrity cannot be accepted as determinative of the constitutional question involved.
In Atlantic Coast Line R. Co. v. City of Lakeland, 94 Fla. 347, 115 So. 669 at page 675, this Court through the late Mr. Justice Ellis held:
"The question of whether property abutting upon a street is in fact specially benefited by the paving of the street does not rest exclusively in the judgment or upon the `ipse dixit' of the municipal officer or officers, if there are more than one, who asserts authority over municipal affairs, but it is a question of fact to be ascertained and established as any other fact, and the proportion of the cost to be assessed against a particular lot must bear a reasonable and fair relation to the special benefits which actually accrued." (Emphasis added.)
In the same opinion it was pointed out that the extent to which property abutting upon a paved street may be said to be "specially benefited" by the paving depends upon a number of circumstances such as the use to which the property is put, whether it is devoted to business or residences and the reasonable cost of the improvement as related to the particular property. A "special benefit assessment" must be levied according to the particular benefits received by the real property in question and in order to sustain the assessment, there must be some proof of the benefits other than the dictum of the governing agency. The actual cost of the improvement must be directly related to the "special benefit" alleged to be received by the property improved.
The proposal before us involves the issuance of bonds in the total amount of $75,000, *577 the proceeds of the sale of which will be used for street paving and drainage. It is provided that an annual "assessment" will be levied against all real property in the district, including homesteads, on an ad valorem basis in an amount sufficient to pay $10,000 each year for principal and interest on the bonds, an estimated $2,218.05 annually to maintain and repair streets and an estimated $930 annually to be paid to the power company for street lighting. Attempt is made to justify the annual "assessment" on the opinion of the County Engineer that in his view all property in the district will benefit in proportion to the ad valorem valuation of the property as it fluctuates from year to year despite the fact that he obviously has no knowledge at all as to what such ad valorem valuations will be in future years, and without any specific determination whatsoever as to the evaluation of benefits to particular parcels that might result from the proposed improvements. In fact such evaluation admittedly was not made.
In all cases assessments against benefited property must be fairly apportioned and lawfully made. See Parrish v. Hillsborough County, 98 Fla. 430, 123 So. 830. An assessment for special benefits must be "according to" or must have a "relation to" or some "reference to" the special benefit resulting to the particular property assessed in order to bring it within the exceptions to the homestead exemption prescribed by Article X, Section 7, of the Florida Constitution.
The ad valorem valuations of the property in the district do not appear anywhere in the proceedings leading up to the authorization of the issuance of bonds nor does any reference to such valuations appear in the record in the trial Court. Furthermore, we find no detailed statement or itemization of the special benefits allegedly to result from the proposed improvement. In considering this case we, like the Court below, have before us only the abstract concepts of ad valorem valuation and alleged special benefits with which to deal and, this, based entirely on the bald opinion of the County Engineer without factual data to support the conclusion. Neither logical nor evidentiary support for a relationship between ad valorem valuation and special benefits is presented by this record and the exhibits filed by the appellee reveal the weakness of its contention to the contrary. It is impossible to determine from this record the amount of the assessment against any particular property, the extent of the benefit from the improvement or the cost of installing the improvement.
Actually, the inherent inequality between ad valorem valuation and special benefits is illustrated by the report of the county official upon which the appellee relied. For example, we are not advised of the assessed valuation of so-called "Government Lot 5" which is included in the district or the ratio between its valuation and those of the platted lots in the remainder of the district, yet, by the report of the engineer relied upon it is specifically pointed out that the "benefits" to be received by Government Lot 5 differed from the benefits to be enjoyed by the platted lots in the remainder of the district. The report recommended that it ought to be assessed on a different basis. Nonetheless, it is required that this unplatted parcel (Government Lot 5) be assessed on the identical basis as the platted lots which abut upon streets to be paved and which admittedly enjoy greater benefits from the proposed improvement. This merely illustrates the fallacy in the whole proposition.
When we subject the proposed "assessment" suggested by this record to the test announced by the precedents, we cannot avoid the conclusion that it is purely and simply an ad valorem tax and that it lacks all the elements of an "assessment for special benefits" within the contemplation of the constitutional provision that permits such a levy against homesteads although it is clothed with all of the elements of ad valorem taxation. In Klemm v. Davenport, 100 Fla. 627, 129 So. 904, 907, 70 A.L.R. 156, we distinguished a "tax" from a "special assessment" in the following language:
"A `tax' is an enforced burden of contribution imposed by sovereign *578 right for the support of the government, the administration of the law, and to execute the various functions the sovereign is called on to perform. A `special assessment' is like a tax in that it is an enforced contribution from the property owner, it may possess other points of similarity to a tax, but it is inherently different and governed by entirely different principles. It is imposed upon the theory that that portion of the community which is required to bear it receives some special or peculiar benefit in the enhancement of value of the property against which it is imposed as a result of the improvement made with the proceeds of the special assessment. It is limited to the property benefited, is not governed by uniformity, and may be determined legislatively or judicially. * * *"
In Crowder v. Phillips, 146 Fla. 428, speaking through Mr. Justice Terrell, we observed that "assessments for special benefits" or special assessments, are peculiar to the premises benefited by some local improvement, such as, paving, draining or grading. They are direct, proximate and reasonably certain of computation and must add something to the use or sale value of the premises benefited above the ordinary value. In the same case On rehearing 146 Fla. 440, 1 So.2d 629, 631, Mr. Justice Thomas suggested a conclusion appropriate to the matter before us when he observed that "It is clear that the tax to be imposed under the provisions of the law under attack is ad valorem on all real and personal property as distinguished from assessments for special benefits to the real property located in the district."
In Whisnant v. Stringfellow, Fla. 1951, 50 So.2d 885, we held that the benefits to be enjoyed by the people of a county from the operation of a county health unit would not support an ad valorem levy against homesteads even though made under the guise of "an assessment for special benefits".
In City of Fort Lauderdale v. Carter, Fla. 1954, 71 So.2d 260, we held that the City of Fort Lauderdale could not make an ad valorem levy against homesteads to acquire revenue to defray the expenses of garbage, waste and trash collection, despite the fact that it was seriously contended that such a service was of direct and substantial benefit to the homesteads served. We cannot, with logic, distinguish between the Fort Lauderdale proposal to collect a tax from homesteads in order to raise money to dispose of garbage and the proposal before us to collect a tax from homesteads to light the streets of the community. Undoubtedly, both services are benefits to the community and to that extent all homestead owners enjoy some benefits but neither service is of a peculiar benefit to a particular homestead to the extent that it would support an ad valorem levy against the homestead in the form of a so-called "assessment" within the framework of our Constitution.
With particular reference to the provision for street lighting in the case before us, but equally applicable to the other aspects of the proposal, the following language from City of Fort Lauderdale v. Carter, Fla. 1954, 71 So.2d 260, 261, is appropriate, to wit:
"In the instant case the tax is laid against all the real and personal property in the city in accordance with its value. As respects real property, no distinction is made between occupied or vacant properties, or, if occupied, whether the property is being used for commercial or residential purposes. Moreover, the tax imposed does not attempt to bear any proportionate relationship to the cost of the service to be rendered as to any particular property. Furthermore, no special or peculiar benefit results to any specified portion of the community or the property situated therein. It seems clear, therefore, that the charge levied against all real and personal property in the city is a general tax imposed for the support of the government and not an assessment against particular properties for special benefits. The levy, therefore, is without constitutional authority insofar as it applies to homestead property." (Emphasis added.)
*579 Perhaps the true nature of the "assessment" here involved can best be revealed by a typical illustration of the contrast between an ad valorem tax and an assessment for special benefits. The typical ad valorem levy is the annual imposition for the operation of the government the amount of which is measured by the budget adopted, the assessed valuation of taxable property and the levy (usually in mills) against the taxable property sufficient to produce the amount necessary to meet the budget. The ad valorem tax on a particular parcel is apt to vary from year to year and it will fluctuate annually in proportion to changes in assessed valuation or the amount of the millage.
An "assessment for special benefits" on the other hand is customarily a fixed amount assessed against a particular parcel of land arrived at by totaling the cost of a public improvement and apportioning it against abutting property specially benefited usually on a front foot or acreage basis without regard to ad valorem valuation of the land. While it is most often payable in annual installments, the amount of such installments is usually fixed at the time the initial levy is made and they do not fluctuate from year to year as the result of changes in ad valorem valuation or increases in the cost of maintaining the improvement.
Admittedly there are variations of these typical illustrations but when the "assessment" under consideration is measured by the illustrations it becomes crystal clear that the imposition here involved is purely and simply an ad valorem tax and nothing else.
It is not to be understood from this opinion that we are holding that such homestead property as there may be in the Golden Shores Special Improvement Service District may not be assessed for special benefits in the true sense or that most of the property in the district may not receive some benefit from street improvement and street lighting, but the "special benefits" must be made to appear and there must be adequate factual data in the record to support the conclusion that the homesteads involved have received the peculiar special benefits charged against them as required by our Constitution. From the cases cited the principle is clear that the framers of the constitutional exemption and the people who approved it manifestly intended that an imposition based on assessed valuation whether for local improvement or general government is one from which homesteads are exempt, while an assessment bearing a logical relation to direct "special benefits" is one to which homesteads may be subjected. See City of Orlando v. State, Fla. 1953, 67 So.2d 673.
Holding as we do that the financing device offered by the record contravenes the organic prohibition against ad valorem levies upon homesteads, we conclude that it is unnecessary to dispose of the contention that the title to the Act involved is defective for failing to indicate that homesteads would be affected by the body of the Act. As to the levy of the annual assessment for maintenance of the streets, it must likewise fall for the reasons announced for invalidating the annual levy for liquidation of the bond principal and interest.
A further reason for disapproving the plan of financing presented by this appeal is that if the annual ad valorem levies proposed to be made are valid "assessments for special benefits" in the constitutional sense, then such levies could actually be made without the necessity of an approving vote of the freeholders. See City of Orlando v. State, supra. While we realize that a referendum was required and was held in the case before us, nevertheless, if the assessments proposed to be made are valid "assessments for special benefits," such referendum added nothing at all to their constitutionality because a referendum is not a necessary condition precedent to a valid "assessment for special benefits" unless specifically required by statute. Therefore, if the so-called assessments before us are granted the benefit of judicial approval, such assessments generally could be made without the necessity of a referendum and *580 this in turn would open the door to unlimited programs for financing public improvements by indirectly employing the ad valorem taxing power under the guise of "assessments for special benefits" in direct violation of Article IX, Section 6, of the Florida Constitution. It would mean that by using the ad valorem valuation type of assessment here employed and the simple expedient of declaring all property in a municipality or other taxing unit to be "benefited" by a proposed improvement, every type of real estate, business, commercial, residential or vacant, could be subjected to the exercise of the ad valorem taxing power for the liquidation of a bonded debt without compliance with the requirements of Article IX, Section 6, regarding the necessity for the approval of freeholders affected by an issue of bonds.
We take judicial notice of the fact that Florida is one of the fastest growing states in the nation. It is consistent with the knowledge that we have that a major factor in this growth is contributed by the attractive ad valorem tax climate engendered by provisions written into our Constitution by the people themselves relating to controls on the funding of long range public debts, the pledging of the ad valorem taxing power and the protection of homesteads against burdensome taxation. To some it might appear that a concession should be made to those interested in the instant project regardless of its constitutionality because two-thirds of them have expressed a willingness to pay the bill. However, the fact remains that we obviously cannot place the stamp of approval on so far-reaching a proposal that is so completely inconsistent with the requirements of our Constitution and which contains such patent potentials for literally wrecking the organic safeguards against unlimited ad valorem taxation which the people have inserted in our fundamental law.
From experience gained over the years as a City and County Attorney, the writer is thoroughly cognizant of the difficulties attendant upon financing public improvements resulting from the prohibitive provisions of our Constitution relating to the exemption of homesteads from taxation as well as the problem of obtaining freeholder approval of general obligation bond issues. Nevertheless, we are not inclined to whittle away at the organic law by a process of judicial erosion that ultimately could completely destroy the beneficent safeguard which the people voted to themselves when they approved the constitutional amendment in question. Although admittedly from the record before us the majority of the homestead owners involved appear to be willing to pay this particular levy, nonetheless, we are compelled to observe that this is one situation where our Constitution does not permit a majority to impose its will upon a minority. Even though the proposed bond issue is relatively small, the approval of the principle of financing here suggested could, and likely would, open a floodgate of financing schemes and devices that would eventually eliminate for all practical purposes the prohibition against taxing homesteads up to a valuation of $5,000. We are bound by the organic law and it is not within our province to ignore it despite the fact that in this particular instance the people who would "pay the piper" apparently wish us so to do.
The decree appealed from is, therefore, reversed.
DREW, C.J., and THOMAS, HOBSON, ROBERTS and BUFORD, JJ., concur.